UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| SEAN YOUNG, FOREVER YOUNG BAKERIES LLC; and FOREVER YOUNG PROPERTIES LLC, | : |
| | : |
| *Plaintiffs*, | : |
| | : |
| vs. | : Civil No. 1:23-cv-00070 |
| | : |
| TOWN OF CONWAY, NEW HAMPSHIRE | : |
| | : |
| *Defendant.* | : |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiffs move for a temporary restraining order. Pursuant to Fed. R. Civ. P. 65(b)(1)(B), Plaintiffs certify that they have notified the Defendant regarding this lawsuit and their Motion for Temporary Restraining Order. This certification is attached to this Motion as Exhibit A.

### INTRODUCTION

This case is a First Amendment challenge to municipal sign regulations that unconstitutionally cast the Town of Conway in the role of censor and discriminate against speech on the basis of what is being said and who is saying it. Plaintiff Sean Young is the owner of Leavitt's Country Bakery through his two LLCs, Forever Young Bakeries LLC, which operates as Leavitt's Country Bakery ("Leavitt's"), and Forever Young Properties LLC, which owns the land upon which the bakery is based.

Sean brings this motion to save a mural that was installed on the façade of Leavitt's in June 2022. The mural, which was designed and painted by local high school art students, features sunbeams shining down on a mountain landscape made entirely of baked goods. Despite the

mural's popularity, Defendant Town of Conway has declared it a "sign" due to what it depicts, thereby forcing Sean to either drastically modify the mural or remove it entirely. If Sean refuses, the Plaintiffs risk both criminal charges and the prospect of hundreds of dollars in fines for every day the Leavitt's mural remains on display in its current form.

The First Amendment does not permit the Town to force Sean to choose between self-censorship and ruinous fines and/or criminal charges. As Supreme Court precedent makes clear, the Town's actions against the Leavitt's mural constitute unconstitutional content based and speaker based restrictions on speech. Such restrictions are subject to strict scrutiny—the highest level of judicial scrutiny—which the Town cannot hope to satisfy. Nor is there any real burden that Conway will suffer, given that the Leavitt's mural has been up for months without issue. Accordingly, this Court should issue a temporary restraining order to protect the mural and preserve the status quo while this lawsuit moves forward.

## FACTS

For over 45 years, Leavitt's Country Bakery has given Conway locals and visitors fresh baked goods and a place to gather. Like the White Mountains, Leavitt's is a Conway institution.

But in 2020, Leavitt's founders, Beth and Ray Leavitt, decided to sell. Local press called it the "end of an era." Sean Young was a longtime customer of Leavitt's. When he heard that prospective buyers wanted to turn Leavitt's into something other than a bakery (such as a gas station or a parking lot), Sean scraped together his resources and bought Leavitt's himself. Thanks to Sean, Leavitt's is still the bakery it has been for decades.

For years, Leavitt's featured a plain red façade above its front door. That changed in early 2022, when Sean was put in touch with the art teacher from the local high school. Sean enthusiastically agreed to allow her students to use the Leavitt's façade as a canvas and gave the

2

students complete artistic freedom to design and paint the mural themselves. Plaintiffs' Verified Complaint ("Compl.") ¶¶ 18-19.

The students took about six weeks to finish the mural on panels measured to the size of the façade. The result was an homage to the White Mountains, with a whimsical twist befitting the beloved local bakery: A painting of sunbeams shining down on a mountain range made of baked goods. The below picture, attached to the Complaint as Exhibit 1, is an accurate representation of the Leavitt's mural. On June 12, 2022, the Leavitt's mural was unveiled with the students, locals and press in attendance. Compl. ¶¶ 21-22.



*The Leavitt's Country Bakery mural, painted by Kennett High School students.*
*Photo credit: The Conway Daily Sun.*

The mural sits above the north-facing entrance of the bakery building. Due to the building's angle, the mural does not squarely face the road and is not easily seen by all passing traffic. Below are Google Street View images of drivers' perspectives of the Leavitt's building as they head north and south, attached to the Complaint as Exhibit 2. Compl. ¶ 23.



*Google Street View of Leavitt's Country Bakery (on left), as seen by drivers driving north.*



*Google Street View of Leavitt's Country Bakery (on right), as seen by drivers driving south.*

Both Sean and the larger community love the mural. People have said to Sean and the Leavitt's staff, as well as to Conway officials, that the mural is a "good thing," "a positive thing for the community," that it "livens up" the area, it "brightens" their day, and that it is "a shining example of teachers, students and community members working in collaboration to bring beauty to the public." Compl. ¶¶ 24-25. The mural process has been such a positive experience for Sean

4

and Leavitt's that Sean wants to do future mural projects, either on another part of Leavitt's, or in the same location. Compl. ¶¶ 26-28.

### Town officials determine the Leavitt's mural is a sign

About a week after the Leavitt's mural was installed, the Town's code enforcer, Jeremy Gibbs, visited Leavitt's. Compl. ¶ 30. His visit was not prompted by a complaint about the mural; rather, he had seen the mural story in the news. Compl. ¶ 31. Mr. Gibbs informed Sean that the painting was not a mural, but rather a sign that was subject to the sign code's size limits. Compl. ¶¶ 32-33. On June 21, 2022, Mr. Gibbs sent Sean's LLC a letter confirming that the mural is a sign subject to the sign code. A true and correct copy of the letter is attached to the Complaint as Exhibit 5. Compl. ¶ 34.

The code imposes strict size limitations on "signs." Section 190-20(F), for instance, applies to the commercial district in which Leavitt's is located, and functionally identical regulations apply to "signs" located in other non-residential zoning districts. Section 190-20(F)(3)(a) of the sign code limits the size of wall signs as follows:

> *Wall sign. For lots without multiple commercial tenants, each lot shall be permitted one wall sign. . . . The height of the message area shall not exceed the greater of 20 feet from the undisturbed ground or a height equal to 75% of the total height of the building, nor shall it exceed the height of the wall to which it is attached. The message area of the wall sign shall be based on the following formulas[.] . . . For floor areas up to and including 50,000 square feet, the maximum message area shall be calculated as follows: 20 + (total square feet floor area X 0.0016).*

In that June 21, 2022 letter, Mr. Gibbs conveyed that the square footage of the bakery is 1,328 square feet, and that, per the formula in § 190-20(F)(3)(a), Leavitt's is allowed a wall sign of only 22.13 square feet. But the mural occupies approximately 91 square feet meaning that, if it is treated as a sign under the Zoning Code, then it is four times bigger than what the Code allows. Compl. ¶¶ 98-102.

Sean was confused, as there are other murals in Conway. When he asked Mr. Gibbs why the Leavitt's mural was considered a sign, Gibbs explained that it was because Leavitt's is a bakery selling baked goods, and the students' painting depicts baked goods.

### The Town discriminates through its sign code

The bakery's situation is due to the distinction that Conway officials make between "murals" and "signs"—a distinction they have enforced for years, and which they make entirely based on the artwork's content and who is displaying it. Compl. ¶ 51. The Conway Zoning Code ("Zoning Code") has an incredibly broad definition of "sign":

> *Any device, fixture, placard, structure or attachment thereto that uses color, form, graphic, illumination, symbol, or writing to advertise, announce the purpose of, or identify the purpose of any person or entity, or to communicate information of any kind to the public, whether commercial or noncommercial. Any portion of any awning, either freestanding or attached to a structure, decorated with any sign element, either attached or part thereof, shall be considered a wall sign.*

Zoning Code § 190-31 (definition section).

Taken literally, this definition would subject everyone in Conway to the sign regulations for any physical display. But in practice, that is not how the Town enforces its sign code.

It turns out that, to Conway officials, the difference between a mural and a sign is whether its message bears any relation to the business displaying it. Section 190-20(F)(1) of the Zoning Code, entitled "Sign content," states that the Town "has no intention of restricting individual free speech, but the Town does recognize its right to place reasonable restrictions upon commercial speech." Accordingly, if Town officials perceive a physical display as conveying a message in any way related to the business, they deem it a "sign." But if officials perceive a physical display as conveying a message unrelated to the business, they deem it a mural. Compl. ¶¶ 53-60.

Town officials have confirmed this is the Town's law, policy and/or practice. At a Town of Conway Zoning Board of Adjustment ("ZBA") hearing in August 2022, Town officials stated

that the Leavitt's mural is a sign because it depicts "the business that is within [the Leavitt's] building," and that it is "the Town's position [that the Leavitt's mural is a sign] [based] solely on the graphic of the donuts and muffins." And during the September ZBA hearing, Town officials stated that the Leavitt's mural is a sign because it depicts "yummy goodies," and that if Leavitt's painted over the baked goods with pictures of things not sold inside, it would be a mural that could stay up as of right. Compl. ¶¶ 79-83.

Town officials have enforced the sign code this way for years. In 2006, the Town enforced its code against an ice cream parlor that had installed ice-cream-cone-shaped trash cans outside the store, with officials determining that the cans' "primary purpose" was to sell ice cream. Likewise, in 2009, the Town enforced its code against a farm stand's mural of a field being plowed, because the image depicted farming and the stand sold farm products. Compl. ¶¶ 62-64.

The Town also has a long history of not enforcing its sign code against exterior displays it considers murals. Settler's Green, which is a Conway shopping center, is home to many murals. Among them is one with the message, "Welcome to North Conway," one depicting the story of New Hampshire heritage, and one depicting giant butterfly wings adorned with purses, sunglasses and the like. Town officials had previously stated that the Settler's Green murals do not meet the Town's definition of a sign, and since 2018 officials had never enforced the sign code against them. This changed in December 2022, when the Town declared for the first time that the three Settler's Green murals were actually "signs." These recent actions against the Settler's Green murals seem to have arisen due to the controversy over the Leavitt's mural. Compl. ¶¶ 68-75.

The Town's decision to enforce its sign code is based on the painting's message and who put it up rather than any threat the painting poses to public health or safety. For instance, approximately 30 feet from Leavitt's entrance, accessed from the same parking area, is a farm

stand that faces the road. Sean asked officials if the Town would consider the Leavitt's mural to be a sign if its content remained the same but it were instead displayed on the farm stand. Town officials told Sean that if Leavitt's painting were displayed on the farm stand, the Town would consider it to be a mural, not a sign—because the farm stand does not sell baked goods. Compl. ¶¶ 86-91.

### *Plaintiffs risk imminent and serious punishment*

Plaintiffs have repeatedly tried to save their mural, but with no success. After Sean received Mr. Gibbs' letter, he appealed the determination that the Leavitt's mural was a sign to the Town of Conway Zoning Board of Adjustment. Compl. ¶ 35. In August 2022, he spoke before the ZBA, arguing that the mural is art, not a sign. Compl. ¶ 37. Other individuals also spoke in support of the mural, including Conway locals, parents of the art students, and the Kennett High School principal. But the ZBA affirmed Mr. Gibbs' determination. Compl. ¶¶ 39-40.

Then Sean applied for a variance. In September 2022, Sean again appeared before the ZBA and, this time, even more people stood up to speak in support of the Leavitt's mural. But the ZBA denied the variance, too. Compl. ¶¶ 41-44.

Then Sean requested a rehearing regarding the variance, which the ZBA considered and denied in November 2022. Compl. ¶¶ 45-46.

Time is now running out for the Leavitt's mural. On January 5, 2023, Sean received a letter, dated December 23, 2022, telling him that he had to bring the Leavitt's mural "into compliance" with the sign code, which would require taking the mural down or altering its message. A true and correct copy of the letter is attached to the Complaint as Exhibit 6. That letter demanded a response within ten days to avoid enforcement proceedings. Compl. ¶¶ 47-48. Those ten days have now passed, meaning that the Town's enforcement action could proceed at any point.

Due to the Town's actions, Plaintiffs now face a harsh choice: either modify the mural, remove it entirely, or face punishment including possible criminal charges and fines of up to $275 each day that the mural remains up. Zoning Code § 190-6(1)(a)-(b); N.H. Rev. Stat. § 676:17. Plaintiffs now move this Court for a temporary restraining order as a last resort to save the Leavitt's mural and their First Amendment rights.

## ARGUMENT

Unless Plaintiffs are granted a temporary restraining order, they will be forced to either destroy the art that adorns their building or be potentially subject to thousands of dollars in fines. But the Town's process by which it deemed the Leavitt's mural to be an illegal "sign" is plainly unconstitutional. A temporary restraining order is therefore necessary and appropriate to preserve the status quo during the pendency of this litigation.

As explained below, Plaintiffs satisfy the four-factor test for temporary restraining orders set forth in the First Circuit. *See Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir. 1981).[1] First and most importantly, Plaintiffs are likely to succeed on the merits. Conway's prohibition on murals depicting anything related to the business displaying them is facially content- and speaker based discrimination. As a result, its distinction between signs and murals is subject to strict scrutiny. Further, because this is a First Amendment case, the Town bears the burden of establishing that this distinction furthers a compelling government interest in a narrowly tailored manner, which the Town cannot hope to do.

Because Plaintiffs have a strong likelihood of success on the merits, they satisfy the remaining factors for obtaining a restraining order. First, Plaintiffs will suffer irreparable harm

---

[1] Although *Belotti* itself involved a motion for preliminary injunction, this Court applies the same four-factor analysis in evaluating a motion for a temporary restraining order. *Nw. Bypass Grp. v. U.S. Army Corps of Eng'rs*, 453 F. Supp. 2d 333, 337 (D.N.H. 2006).

without a restraining order, because the loss of First Amendment rights is always considered irreparable. And it is absolutely certain that this harm will occur without a TRO: The Town at least three times has refused to allow Leavitt's to keep its mural up as is. And its late December 2022 letter, which Plaintiffs only received earlier this month, makes clear that the Town intends to immediately initiate enforcement proceedings against the bakery unless it removes its mural.

The Town, by contrast, will not be harmed by a TRO, because the Town will not be required to take any action or obligate any funds. Nor will a TRO harm the public interest. The mural has been up since June 2022 with no ill effect. And it is always in the public interest to protect First Amendment rights.

In short, a TRO's only effect will be to preserve the status quo and prevent Conway from fining Leavitt's for its mural while this case moves forward.

## I.      Leavitt's has a strong likelihood of success on the merits.

The Supreme Court's decision in *Reed v. Town of Gilbert*, 576 U.S. 155 (2015) demonstrates why Conway's enforcement of its mural regulations against Leavitt's is unconstitutional. In that case—which also involved a sign code—the Court clarified the tests for deciding if a law is content-based. In doing so, the Court set forth two independent standards under which a law will be deemed content based, either of which is sufficient to trigger strict scrutiny.

First, a law is content based if it distinguishes between permissible and impermissible speech based on "the topic discussed or the idea or message expressed." *Id.* at 164. Under this test it is irrelevant whether the law was adopted for benign motives or censorial motives. *Id.* at 166 ("[A]n innocuous justification cannot transform a facially content-based law into one that is content neutral."). The only thing that matters is whether the government allows some types of content while disallowing others.

10

Second, a law is content based if it was adopted for content based reasons. Under this test, the government's motive is paramount. Even a facially content neutral law will be deemed content based and subject to strict scrutiny if the evidence indicates it was adopted for the purpose of suppressing speech. *Id.* at 164.

As explained below, Conway's discriminatory treatment of murals the Town deems related to the businesses displaying such murals is facially content and speaker based. Because Conway's regulation turns entirely on who is doing the speaking and what is being said, the government must demonstrate that its mural restrictions satisfy strict scrutiny, which it cannot.

### A. The Town's prohibition on murals with content related to the party displaying the mural is a content and speaker based restriction on speech.

Laws "defining regulated speech by particular subject matter" are "obvious[ly]" content based. *Id.* at 163-64. And that's clearly the case here: The Town permits murals that convey messages that it deems to be unrelated to the business displaying the mural, but treats as "signs" any murals that—in the view of Town officials—are so related. That distinction does not turn on any non-communicative aspect of any given mural, such as its size, color, etc. Instead, whether a mural is permitted or prohibited "depend[s] entirely on [its] communicative content." *Id.* at 164.

Again, under this first *Reed* test, it is irrelevant whether Conway's prohibition was adopted for censorial reasons. The Supreme Court has "made clear that illicit legislative intent is not the *sine qua non* of a violation of the First Amendment, and a party opposing the government need adduce no evidence of an improper censorial motive." *Id.* at 165 (cleaned up).

It is also irrelevant that the Town's prohibition on murals related to the business displaying them treats all such murals equally and does not favor or disfavor any viewpoint. As the Supreme Court reiterated in *Reed*, "a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *Id.* at 169.

11

Accordingly, the Town's prohibition on murals displaying messages related to the business hosting the mural is a content and speaker based regulation, even though it does not distinguish between permissible and impermissible messages or speakers. *See id.* ("[A] law banning the use of sound trucks for political speech—and only political speech—would be a content based regulation, even if it imposed no limits on the political viewpoints that could be expressed.").

Indeed, the Supreme Court has struck down restrictions that arbitrarily treat what officials perceive to be commercial speech differently from noncommercial speech. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 572-73 (2011) (declaring unconstitutional restriction on pharmacies selling certain information to companies for marketing purposes when the same information could be sold and used for other, non-commercial purposes); *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429-31 (1993) (declaring unconstitutional city's ban on news racks dispensing commercial publications when city allowed news racks dispensing non-commercial publications).

### B. Because Conway's prohibitions on murals related to what the displaying business does is a speaker based and content based restriction, they are subject to strict scrutiny, which Conway cannot survive.

Content based regulations—whether content based in execution or in purpose—are subject to strict scrutiny, as are speaker based regulations. *Id.* at 164. This is the most demanding standard in constitutional law: Under strict scrutiny, restrictions on speech are presumptively invalid. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011). Moreover, the burden of satisfying strict scrutiny falls on the government, which must prove that its restrictions are justified by a compelling government interest and are narrowly drawn to serve that interest. *United States v. Playboy Ent.*

*Grp.*, 529 U.S. 803, 818 (2000). Indeed, the government bears that burden even at preliminary stages like this TRO proceeding.[2]

"It is rare that a regulation restricting speech because of its content will ever be permissible." *Id.* Those infrequent cases in which the government meets this burden involve weighty issues such as preventing terrorism or preserving judicial integrity. *See, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010); *Williams-Yulee v. Fla. Bar*, 575 U.S. 433 (2015).

This is not such a case. There is no compelling government interest at play here; indeed, there's no reason to believe that the Leavitt's mural poses any risk to the public at all, given that it has been up for months without incident. Nor does it somehow pose any more of a public health and safety risk than the other murals that Conway has allowed to remain. Indeed, Conway's discrimination against murals that depict messages related to the business displaying them is the sort of underinclusiveness that the Supreme Court has held fails strict scrutiny. *Reed*, 135 S. Ct. at 172 ("[A] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited."). Because the government cannot justify its discrimination against certain messages and speakers, Leavitt's is likely to succeed on the merits.

## II.    Leavitt's satisfies the remaining *Bellotti* factors.

Having shown that Leavitt's is likely to succeed on the merits, the remaining *Bellotti* factors—regarding irreparable injury, the public interest, and the balance of equities—are easily disposed of. "In the First Amendment context, the likelihood of success on the merits is the

---

[2] *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) (holding that the party that bears the burden of proof at trial bears the burden of proving likelihood of success on the merits).

linchpin of the preliminary injunction analysis." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10-11 (1st Cir. 2012).

First, it is well-established in this Circuit that Plaintiffs' "loss of First Amendment freedoms constitutes irreparable injury" justifying issuance of injunctive relief. *Fortuño*, 699 F.3d at 15 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Second, the balance of equities tips towards Plaintiffs. This factor compares "the hardship to the nonmovant if enjoined as contrasted with the hardships to the movant if no injunction is granted." *Esso Standard Oil Co. (P.R.) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006) (quoting *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004)). Here, an injunction would simply maintain the status quo by allowing Leavitt's to keep displaying its mural while this case proceeds. It would not require the Town to take any action or obligate any funds. *See Legend Night Club v. Miller*, 637 F.3d 291, 302-03 (4th Cir. 2011) (holding that government is not "harmed by issuance of an injunction that prevents [it] from enforcing unconstitutional restrictions"). And given that the mural has been up for months without incident, the Town would suffer no real injury should an injunction issue. But if Leavitt's does not obtain injunctive relief, Plaintiffs would face a heavy burden: either sacrifice their First Amendment rights or else risk prosecution and thousands of dollars in fines. The First Amendment does not allow Plaintiffs to be put to that choice. *Atl. Beach Casino, Inc. v. Morenzoni*, 749 F. Supp. 38, 42 (D.R.I. 1990) (holding that balance of equities fell in the plaintiffs' favor in part because "[i]n the pantheon of constitutional rights, the First Amendment is indeed the 'First' treasured among all").

Lastly, the public interest favors an injunction. "It is hard to conceive of a situation where the public interest would be served by enforcement of an unconstitutional law or regulation." *Condon v. Andino, Inc.*, 961 F. Supp. 323, 331 (D. Me. 1997). To the contrary, "[w]hen a

14

constitutional violation is likely . . . the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights." *Magriz v. Union de Tronquista de Puerto Rico, Local 901*, 765 F. Supp. 2d 143, 157 (D.P.R. 2011) (quoting *Miller v. City of Cincinnati*, 622 F.3d 524, 540 (6th Cir. 2010)). Given that huge numbers of Conway residents have come out to support Leavitt's and its mural, granting the injunction will further the public interest, particularly given that the TRO's only effect would be to allow Leavitt's to continue to display its mural without penalty during the pendency of this litigation.

### III.    This court should set a bond at either zero dollars or a nominal amount.

Under Federal Rule of Civil Procedure 65(c), this Court may issue a temporary restraining order only if the applicant provides a bond in an amount determined by the Court. This Court, however, may set the bond in whatever amount it finds proper, and may set the bond at a nominal amount—or even at zero dollars—if there is no risk of financial harm to the enjoined party. *See, e.g.*, *Crowley v. Local No. 82, Furniture & Piano Moving,* 679 F.2d 978, 1000 (1st Cir. 1982), *rev'd on other grounds*, 467 U.S. 526 (1984) (recognizing that district court may waive bond requirement in "suits to enforce important federal rights or 'public interests'"). There is no danger the Town will suffer any financial damage or incur any unrecoverable costs if Plaintiffs are permitted to display their mural. For these reasons, Plaintiffs request that, if their motion is granted, this Court set the bond at either zero dollars or in the nominal amount of one dollar.

### CONCLUSION

For the reasons set forth above, this Court should grant the motion for a temporary restraining order and set the required bond at either zero dollars or in the nominal amount of one dollar.

RESPECTFULLY SUBMITTED this 31st day of January 2023,

/s/ John M. Crabbs, II
John M. Crabbs, II (NH Bar No. 275043)
COOPER CARGILL CHANT, P.A.
2935 White Mountain Highway
North Conway, NH 03860-5210
603-450-5000
jcrabbs@coopercargillchant.com

/s/ Robert Frommer
Robert Frommer (VA Bar No. 70086)*
Elizabeth Sanz (CA Bar No. 340538)*
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Ste. 900
Arlington, Virginia 22203
(703) 682-9320
rfrommer@ij.org
bsanz@ij.org

*Counsel for Plaintiffs*

*Admission Pro Hac Vice Pending*

16