UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE


<u>Sean Young, et al.</u>


      v.                                Civil No. 23-cv-00070-JL
                                              Opinion No. 2025 DNH 063

<u>Town of Conway, New Hampshire</u>


## **BENCH TRIAL ORDER**

This case concerns the constitutional permissibility of the enforcement of a municipal sign ordinance against a local bakery.  Plaintiff Leavitt's Bakery, through its owners Sean Young, Forever Young Bakeries LLC, and Forever Young Properties LLC, brings this civil rights action against the town of Conway, New Hampshire, challenging under the First Amendment its enforcement of a local ordinance that limits the size, height, and number of signs that a property can display.  Young and his bakery request declaratory and injunctive relief prohibiting the town from taking any enforcement or other action against the plaintiffs for their display.[1]  The parties submitted briefing and introduced testimony and evidence during a one-day bench trial.[2]  The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 as this action arises under the Constitution and laws of the United States.  The Court has authority to grant declaratory relief under 28 U.S.C. § 2201.

Because the town's enforcement of the ordinance would not pass any level of scrutiny, the court grants the plaintiffs' request for injunctive and declaratory relief.[3]

The plaintiffs make no facial challenge to Conway's sign code.  So the court here does not rule that the sign code is unlawful or unconstitutional as written.  Neither does it rule that Conway could not lawfully regulate the Leavitt's display, or that the display does not violate the sign code *as written*.  Nor does the court rule that the Leavitt's display is not commercial speech (as it certainly appears to be), that municipalities may not regulate commercial signage like the display at issue here,[4] or that the sign code

---

[1] Compl. (doc. no. 1) at 22.

[2] The court ordered a bench trial after finding that the parties' preferred procedure, cross-motions for summary judgment, yielded a less-than-satisfactory record to resolve the case.

[3] *Id.*  As discussed in more detail *infra*, Section III.c., the court grants a narrower form of the declaratory relief the plaintiffs requested in the complaint.

[4] *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 174-75 (2015) (Alito, J., concurring) ("This does not mean, however, that municipalities are powerless to enact and enforce reasonable sign regulations," including "[r]ules regulating the size of signs," or "distinguishing between on-premises and off-premises signs.").

necessarily implicates any particular level or tier of First Amendment scrutiny. The court rules only that Conway's application of its sign code, and specifically its enforcement of the sign code to the Leavitt's sign in the particular manner it employed in this case, does not withstand any level of constitutional scrutiny.

## I.    Legal standard

"[I]njunctive relief may be ordered where (1) the plaintiff has prevailed on the merits, (2) the plaintiff would suffer irreparable injury in the absence of injunctive relief, (3) the harm to the plaintiff would outweigh the harm to the defendants from an injunction, and (4) the injunction would not adversely affect the public interest." *Joyce v. Town of Dennis*, 720 F.3d 12, 25 (1st Cir. 2013). Injunctive relief is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

## II.    Factual Background[5]

### a.    Conway's enforcement of its sign code against the Leavitt's display

The town of Conway is a popular tourist destination in the White Mountains. Plaintiff Sean Young owns Leavitt's Country Bakery, a local bakery in North Conway, a village in the town. The bakery is in the town's "Highway Commercial District."[6] In June 2022, Young erected a display painted by local high school art students on top of his bakery.[7] The display shows a mountain landscape depicting baked goods, with a sun shining over them in multi-colored rays. The sun's rays match—in shape, color, theme and "sunburst" configuration—the bakery's dormer, displayed directly below, which also includes the bakery's logo: its name and a picture of a pie.[8]



*Figure 1: Leavitt's Country Bakery display and dormer. Ex. A (doc. no. 32-4) at 1.*

---

[5] This section consists of factual findings pursuant to Fed. R. Civ. P. 52(a)(1).
[6] Statement Agreed Facts (doc. no. 45) at ¶ 3.
[7] *Id.* at ¶¶ 5, 9.
[8] *See* Tr. AM (doc. no. 57) at 27:8-28:9.

The bakery later used a picture of the display and logo on its donut boxes.[9]



*Figure 2: Picture of Leavitt's donut box. Trial Ex. 2.*

A week after Young erected the display, after seeing news coverage of the unveiling, a Conway zoning officer, Jeremy Gibbs, visited Leavitt's Bakery and spoke to Young about the display. [10] He determined that, because the donut and muffin mountains represented the products in the building, the display fit the town's definition of a "sign," and violated the town's zoning code regulating "signs" because of its size.[11] (As noted *infra* Section II.c., although the display may have violated the sign code because of its size, Gibbs' determination was based on a rationale with no textual basis in the sign code, which does not distinguish between displays based on content.) The sign code regulates displays that "communicate *information of any kind to the public, whether commercial or noncommercial.*"[12]  *See infra* Section II.b. (emphasis added). Young challenged Gibbs' determination and asked if the display would meet the town's definition of a sign if it instead read "The Town of Conway hates the Kennett High School art students."[13]  Gibbs (again, in the court's view, without any textual basis in the sign code) said that in that case, the display would not be a sign under the town's zoning code so its size would not be an issue.[14]  Young also offered to remove the dormer with the logo, but Gibbs said the dormer "wasn't the problem."[15]  Following his visit, Gibbs issued a notice of violation to Young, informing Young that the display violated Section 190-20(F)(3) of the town's

---

[9] *Id.* at 53:15-55:10.

[10] Statement Agreed Facts (doc. no 45) at ¶¶ 10-11.

[11] Tr. AM (doc. no. 57) at 31:18-32:5, 32:18-33:10.

[12] This is not to say that Zoning Officer Gibbs' determination that the display was a sign was incorrect, but rather that his classification of the display as a sign *because of its depiction of baked goods* has no textual basis in the sign code.

[13] *Id.* at 33:3-7.

[14] *Id.*

[15] *Id.* at 32:6-19. The parties clarified that the dormer with the logo was not a "sign" for purposes of the wall sign ordinance because it qualified as a "directional sign." Town ordinances permit one "wall sign" and one "directional sign" on a commercial property. *Id.* at 125:23-126:15.

zoning code, namely the provision regulating "wall signs," because of its size.[16]

Young appealed the citation to the town zoning board (ZBA), arguing that the display was not a sign but a mural, which would not be subject to the same size restrictions.[17] After a hearing, the ZBA declined to reverse Gibbs' determination.[18] Young subsequently applied for, and was denied, a variance for the display.[19] After an additional appeal to the ZBA, also denied, the town sent Young a second letter demanding compliance with the town's "wall sign" ordinance to avoid further enforcement proceedings.[20] As explained *infra*, Section II.c., these decisions were based on similar mis-readings or misapplications of the sign code as applied by Zoning Officer Gibbs.

Young filed this action in January 2023, within weeks of receiving the second letter.

### b. Conway's sign code

Section 190-31 of the town's zoning code defines "wall signs" as:

> "Any device, fixture, placard, structure or attachment thereto that uses color, form, graphic, illumination, symbol, or writing to advertise, announce the purpose of, or identify the purpose of any person or entity, or to communicate information of any kind to the public, whether commercial or noncommercial. Any portion of any awning, either freestanding or attached to a structure, decorated with any sign element, either attached or part thereof, shall be considered a wall sign."[21]

Section 190-20(F)(3)(a) imposes size, height, and number restrictions on wall signs:

> "For lots without multiple commercial tenants, each lot shall be permitted one wall sign. The height of the message area shall not exceed the greater of 20 feet from the undisturbed ground or a height equal to 75% of the total height of the building, nor shall it exceed the height of the wall to which it is attached. The message area of the wall sign shall be based on the following formulas[.] . . . For floor areas up to and including 50,000 square feet, the maximum message

---

[16] Statement Agreed Facts (doc. no 45) at ¶¶ 12, 17.

[17] *Id.* at ¶ 14.

[18] Statement Agreed Facts (doc. no 45) at ¶ 14.

[19] *Id.* at ¶ 15.

[20] Trial Ex. 12 at 1; Trial Ex. 5.

[21] Statement Agreed Facts (doc. no 45) at ¶ 27.

area shall be calculated as follows: 20 + (total square feet floor area
X 0.0016)."[22]

Section 190-6(1)(a) makes failure to comply with the sign code a misdemeanor for
a "natural person" and a felony for "any other person."[23]  Section 190-6(1)(b) and N.H.
Rev. Stat. § 676:17 subject a person who fails to comply with the sign ordinance, as
enforced by the town, to a civil penalty of "$275 for the first offense, and $550 for
subsequent offenses, for each day that such violation is found to continue after the
conviction date or after the date on which the violator receives written notice from the
municipality[.]"[24]  The parties agree that if Young and Leavitt's Bakery do not comply
with the sign code as enforced by the town, they are subject to the criminal and civil
penalties provided in the Town of Conway Zoning Code § 190-6(1)(a)-(b) and N.H. Rev.
Stat. § 676:17.[25]

### c.  Town's interpretation of sign code

The parties agree that if town officials perceive a physical display as conveying a
message in any way related to business, they deem the physical display a sign.[26]  (While
such displays may be, and likely are in fact, signs under the code, the court views the
town's approach as stipulated (and proven at trial) to be *analytically* incorrect.  *See also
infra*, Section III.c.)  The parties agree that if the town had decided that the Leavitt's
painting was not a sign, then the sign code, including its size limitations, would not
apply.[27]  In statements by ZBA members and Jeremy Gibbs, Conway's code enforcement
officer and Rule 30(b)(6) representative in this litigation,[28] the town explained its
interpretation of the sign code and how it is enforced.[29]  For example, ZBA members

---

[22] *Id*. at ¶ 31.

[23] *Id*. at ¶ 22.

[24] *Id*. at ¶ 23.

[25] *Id*. at ¶ 24.

[26] *Id*. at ¶ 34.

[27] *Id*. at ¶ 33.

[28] *See* Fed. R. Civ. P. 30(b)(6).

[29] As statements made by the town's agents in acting within the scope of their employment, these
are statements by the town.  *See McDonough v. City of Quincy*, 452 F.3d 8, 21 (1st Cir. 2006)
(holding out-of-court statements about police officer by city officials were properly admitted
under Fed. R. Evid. 801(d)(2)(D) because officials were involved in personnel management and
had made statements about a possible personnel action against the police officer); *Fair Fight
Action, Inc. v. Raffensperger*, 599 F. Supp. 3d 1337, 1342 (N.D. Ga. 2022) (finding that a
member of the state election board was an agent of the board for purposes of consideration of his
deposition testimony); *Krause v. Kelahan*, 575 F. Supp. 3d 302, 311 (N.D.N.Y. 2021) (finding
that out-of-court statements made by members of a school board are admissible under Fed. R.
Evid. 801(d)(2)(D) in a case against the school district).  Gibbs clarified at trial that while he
issues initial citations to sign owners for violations, ultimately the ZBA makes the final
determination on sign code violations.  Tr. AM (doc. no. 57) at 133:2-24.

made the following statements interpreting the sign ordinance:

- "If it's a mural and it represents what you're doing as the business, then it fits the definition of a sign."[30]
- The Leavitt's painting "meets the definition [] of a sign in that [] it's showing what is inside that building."[31]
- "[B]y the sign definition, it represents the product that's being sold[.]"[32]

They also made remarks specifically construing their interpretation of the ordinance with respect to the Leavitt's sign, saying, for example:

- "[W]hat makes it a sign is the pastries."[33]
- Because it "depict[s] all the yummy goodies that can be found within [Leavitt's], [the painting] is by definition . . . a sign."[34]
- "[If] it did not represent what [Leavitt's] business is in, then it would be more likely to be a well-respected piece of art and not construed as a sign."[35]
- "[I]f the mural was [of the] New England Scenic Mount Washington Valley [it] wouldn't be a sign" or if the painting had depicted "covered bridges and sunflowers and what have you," it would not be a sign.[36]
- The display qualified as a sign "solely because of the graphic of the donuts and the muffins" and that if the painting had instead depicted "sunshine with the mountains," it would have been "fine."[37]
- "The Board determined that [the Leavitt's painting] was a sign" because there are "muffins and pastries, and I think there are donuts on there."[38]

In the court's view, all of these statements are either incorrect as stated, or analytically unsupportable under the sign code as written.

During the hearings, ZBA members offered potential "compromise" solutions to Leavitt's to prevent enforcement of the sign code's size restriction.[39] The "solutions" proposed by the ZBA centered on changing aspects of the display, or its location, to exclude it (unsupportably, in the court's view) from the town's definition of a "sign."[40]

---

[30] Statement Agreed Facts (doc. no. 45) at ¶ 36.

[31] *Id.* at ¶ 37.

[32] *Id.* at ¶ 38.

[33] *Id.* at ¶ 39.

[34] *Id.* at ¶ 43.

[35] *Id.* at ¶ 41.

[36] *Id.* at ¶ 42.

[37] *Id.* at ¶ 44.

[38] *Id.* at ¶ 50.

[39] Tr. AM (doc. no. 57) at 49:20-50:11; *see also* Trial Ex. 10 at 54:22-55:11.

[40] Trial Ex. 10 at 54:22-55:11.

For example, at the September hearing, ZBA members said that if the Leavitt's painting had been displayed elsewhere, it would have been a "mural" and not a "sign," thus excluding it from regulation.[41]  At the same the hearing a member of the public asked, "If [Young] was to take that sign and move it to the back building, which is not part of the bakery, would it still be a sign or would it be a mural?"  The ZBA Chair responded that "[I]t would be a mural."[42]

ZBA members also discussed changing the content of the sign as a way to exclude it from the sign definition (again incorrectly, based on the express provision of the sign code), and thus the size restrictions for signs.  One ZBA member said that "if [Young] blocked the representation of product [on the painting,] nothing would have been a problem."[43]  Similarly, in response to a question from a local reporter, a ZBA member confirmed that "[a] way out of this [is] by painting over the muffins and the mountains, which they're supposed to symbolize. [I]f you paint [] over the things that are sold inside and just make it a landscape painting, [t]herefore it's a mural and therefore it doesn't have to be a sign."[44]

### d.  Application of the sign code to other displays

Conway has previously enforced the same provision of its sign code against other town businesses.  Here again, as was the case with Leavitt's, the town's enforcement was based on distinctions unsupported by the provisions of the sign code.

In 2006, the town enforced the code against local ice cream parlor Lickety Splitz.  Outside of its store, Lickety Splitz installed trash cans to look like ice cream cones, with large fiberglass icecream-scoop shapes on top of them. Town officials found that because Lickety Splitz sold ice cream, and the trash cans were displays shaped like ice cream cones, the "primary purpose" of the trash cans was to sell ice cream, making the trash cans "signs."[45]  The town determined the Lickety Splitz trash cans were signs subject to regulation but the ZBA granted a variance, allowing Lickety Splitz to keep the trash cans.[46]

Also in 2006, the town enforced its sign code against displays that the Mt.

---

[41] *Id.* at 23:19-21("MR. PIERCE: So if this was somewhere else, it'd be a mural.  And we don't have any restrictions on murals, do we? THE CHAIR: No. No. No. No.").  In 2024, two years after the enforcement against Leavitt's, the town added a section to the zoning code regulating "murals" separately.

[42] Statement Agreed Facts (doc. no 45) at ¶ 47.

[43] *Id.* at ¶ 48.

[44] *Id.* at ¶ 49.

[45] *Id.* at ¶ 51; s*ee also* Tr. PM (doc. no. 58) at 17:21-18:6 ("Q: Okay. So -- so regular trash cans are allowed but ice cream shaped trash cans are not allowed; is that right? A: Well it's a -- yeah I would say that if it's advertising the business activity, that's where they're deemed the sign. Q: So if -- if ice cream cone shaped trash cans were not in front of an ice cream store then they -- they wouldn't be a problem; is that the idea? A: I would presume that since it's not advertising what's for sale with inside the business, I would suggest that that would be true.").

[46] Statement Agreed Facts (doc. no 45) at ¶ 51.

Washington Observatory, a private non-profit, mounted on the windows of its offices in town. The displays were photographic artworks featuring images of the Mt. Washington Observatory.[47]



*Figure 3: Mt. Washington Observatory's photographic displays.  Ex. J (doc. no. 32-13) at 2.*

The large photographs—deemed signs by the town—covered two of the of the building's front windows.  The ZBA again granted a variance allowing the observatory to keep both window displays.[48]

In 2007, the town enforced its sign code against displays installed by Joe Jones Ski & Sport, a sporting goods outfitter that sold equipment for recreation in the Mt. Washington Valley: window screens depicting photographs of sporting goods like mountain bikes and skis. Joe Jones argued that the images depicted the lifestyle of the valley, but town officials determined they were signs, stating the screen images were related to the business. A ZBA member told Joe Jones that "if there was a picture of a flower it may not violate the zoning laws as Joe Jones does not sell flowers."[49]  ZBA Vice Chair Chalmers testified in his deposition that the screens were determined to be signage because "[i]t was content," referring to "mountain bikes, skis . . . ."[50] Joe Jones did not appeal the decision, instead opting to remove the window screens.

In 2009, the Town enforced its sign code against a painted display by Weston's Farm Stand.[51] The outdoor painting featured the words "Weston's Farm," and depicted

---

[47] *Id.* at ¶ 52.

[48] *Id.*

[49] *Id.* at ¶ 53.

[50] *Id.*

[51] *Id.* at ¶ 54.

horses working in a field.[52] Town officials deemed the display a sign because the painting featured goods that were for sale at the farm stand. The town granted a variance on condition that Westons removed an existing roof sign.

In December 2022, while the current controversy over the Leavitt's display was ongoing, the town enforced its sign code against a local outdoor mall called Settler's Green.[53] The town issued notices of violation to Settler's Green for two of its displays: (1) a timeline-like montage representing people and events significant to New Hampshire history and heritage, and (2) a painting featuring butterfly wings where various items including sunglasses, shoes, and handbags, are depicted as the butterfly's eyespots, with a small social media hashtag in the corner.[54]



*Figure 4: Heritage display at Settler's Green. Ex. N (doc. no. 32-17) at 2.*



*Figure 5: Wings display at Settler's Green.  Ex. O (doc. no. 32-18), at 2.*

---

[52] *Id.*
[53] *Id.* at ¶¶ 55-59.
[54] *Id.* at ¶ 60.

Both displays decorate the mall buildings' exterior walls.  Settler's Green appealed the citations to the ZBA, which determined in an April 2023 hearing that the Wings display was a sign, likening it to "paint[ing] a picture of a pocketbook in [a] place that sells pocketbooks[;] clearly advertising."[55]  ZBA members suggested that Settler's Green could "remove the commercial aspect" of the Wings display by painting over the images of pocketbooks and purses while leaving the wings.[56]  Settler's Green applied for an equitable waiver and a variance for the Wings display, both of which the town denied.[57]

### e.  Post-litigation enactment of mural ordinance

In April 2024, while discovery in this litigation continued, the Town of Conway adopted an amendment to the zoning code that purports to regulate "public art."[58]  Although the town has not brought an enforcement action against him under the newly enacted amendment, Young requested leave to add a new claim to the complaint challenging the new ordinance, claiming that he would be "directly affected" by the new ordinance because he has "expressed his interest in pursuing more mural projects in the future" at his businesses in Conway.[59]  The court denied leave to amend.

### f.  Litigation

The parties initially agreed that this matter should be resolved on purely legal arguments through cross motions for summary judgment.  Dissatisfied with the record underlying those motions as well as what it deemed material disputes of fact,[60] this court ordered a bench trial and permitted discovery, which the parties conducted.  A bench trial followed.

## III.    Discussion[61]

### a.  First Amendment scrutiny

The First Amendment, which applies to the states through the Fourteenth Amendment, prohibits the enactment of any "law ... abridging the freedom of speech." U.S. Const. amend. I. Young argues that the town's sign ordinance, as applied to his bakery's display, was a content-based restriction on his speech that violated the First Amendment.

---

[55] *Id.* at ¶ 65.

[56] *Id.* at ¶ 66.

[57] *Id.* at ¶ 68.  Settler's Green brought suit against the town in New Hampshire state court.  That action is on hold pending the resolution of this action.  Pl. Mot. Summ. J. (doc. no. 32-1) at n. 16. The court notes that this case could also have been adjudicated in Superior Court in New Hampshire—without the constitutional dispute—based solely on the substantial mismatch between the language of the sign code and Conway's enforcement of it.

[58] Ex. C to Pls.' Mot. Suppl. Compl. (doc. no. 25-3) at 5; Ex. D to Pls.' Mot. Suppl. Compl. (doc. no. 25-4) at 2.

[59] Pls.' Mot. Suppl. Compl. (doc. no. 25) at 6; Compl. (doc. no. 1) ¶ 26.

[60] *See, e.g.* Def.'s Opp. Mot. Summ. J. (doc. no. 36) at 2-7 (discussing disputed facts).

[61] This section consists of legal rulings under Fed. R. Civ. P. 52(a)(1).

As requested and agreed by the parties, the court considers this as-applied challenge without addressing the ordinance's facial validity. Young stated repeatedly, both in his filings and at trial, that he brings an as-applied challenge only,[62] and the parties focused solely on the town's enforcement of the ordinance in the briefing and at trial. "[I]t is not 'generally desirable' to consider a facial First Amendment challenge 'before it is determined that the statute would be valid as applied,'" *Mahoney v. Doe*, 642 F.3d 1112, 1116 (D.C. Cir. 2011) (quoting *Board of Trustees of State University of New York v. Fox,* 492 U.S. 469, 484–85 (1989)). Similarly, the plaintiff does not raise any vagueness or overbreadth arguments regarding the ordinance itself.[63] Because the plaintiffs' challenge and requested relief is limited to the town's enforcement of its sign ordinance against the bakery's display, the court does not address the facial constitutionality of the ordinance, nor raise *sua sponte* any vagueness or overbreadth concerns. *See United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 477–78 (1995) ("[A]lthough the occasional case requires us to entertain a facial challenge in order to vindicate a party's right not to be bound by an unconstitutional statute, []we neither want nor need to provide relief to nonparties when a narrower remedy will fully protect the litigants.") (internal citations omitted).

   ***Content regulation.*** Content-based restrictions "target speech based on its communicative content"—that is, they "appl[y] to particular speech because of the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC,* 596 U.S. 61, 69 (2022) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). Content-based restrictions are subject to strict scrutiny, requiring "the government to demonstrate that the restriction advances a 'compelling interest' and is 'narrowly tailored to achieve that interest,'" *McCoy v. Town of Pittsfield*, 59 F.4th 497, 506 (1st Cir. 2023) (quoting *Signs for Jesus v. Town of Pembroke*, 977 F.3d 93, 101 (1st Cir. 2020)).

   "Content-neutral restrictions, by contrast, 'serve[] purposes unrelated to the content of expression,' and are subject to intermediate scrutiny, which requires that the restrictions be 'narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Signs for Jesus*, 977 F.3d at 101 (alteration in original) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). "The government's purpose is the controlling

---

[62] *See, e.g.*, Pls.' Post-Trial Mem. (doc. no. 56) at 7 ("[The plaintiffs] do not challenge the Town's sign code writ large, including its size restrictions. Nor do they challenge the written definition of 'sign,' which is clear in meaning but incredibly broad in scope. []Plaintiffs only seek to save the students' artwork, relief does not reach beyond their particular circumstances.")

[63] *But see*, Conway ZBA Aug. 17, 2022 meeting record (Trial Ex. 7) at 10:4-12 ("ZBA MEMBER: At the at the bottom of it, I'm going to read you how the Town defines a sign. 'Any device, fixture, placard, structure or attachment thereto that uses color, form, graphic, illumination, symbol or writing to advertise, announce the purpose of or identify the purpose of a person or entity to communicate information of any kind to the public.' Randy Cooper, a brilliant legal mind has called this -- this very definition unconstitutionally vague. And I agree with him.").

consideration. A regulation that serves purposes unrelated to the context of expression is deemed neutral." *Rideout v. Gardner*, 838 F.3d 65, 71 (1st Cir. 2016) (quoting *Rock Against Racism*, 491 U.S. at 791).

Conway's sign code is at least arguably content-neutral, applying as it does to displays that "communicate *information of any kind* to the public, whether commercial or noncommercial."[64] A "facially content-neutral restriction may be treated as content-based if it cannot be 'justified without reference to the content of the regulated speech' or was 'adopted by the government 'because of the disagreement with the message [the speech] conveys.'" *McCoy*, 59 F.4th at 506 (quoting *Reed*, 576 U.S. at 164) (alteration in original). "To show that a facially content-neutral regulation is subject to strict scrutiny, the plaintiff must show not only that the restriction distinguishes between speakers, but also that it 'reflects a content preference.'" *Signs for Jesus*, 977 F.3d at 101 (quoting *Reed*, 576 U.S. at 170). "[W]here the evidence indicates that the challenged regulation was enacted to advance a purpose unrelated to content preference, it is subject only to intermediate scrutiny." *Id.* at 101-02. Thus, a sign restriction which is "agnostic as to content" but "requires an examination of speech [namely, reading the sign at issue] only in service of drawing neutral, location-based lines" does not trigger strict scrutiny. *City of Austin*, 596 U.S. at 69.

***Commercial speech.*** Commercial speech is speech that "propose[s] a commercial transaction." *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976). Although truthful non-misleading commercial speech is protected by the First Amendment, it "is entitled to less extensive First Amendment protection than 'noncommercial speech.'" *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 309 (1st Cir. 2005); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557 (1980); *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011). To sustain a targeted commercial speech restriction, the town "must show at least that the [restriction] directly advances a substantial governmental interest and that the measure is drawn to achieve that interest." *Sorrell*, 564 U.S. 552 at 572 (citing *Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480-81 (1989) and *Central Hudson Gas*, 447 U.S. at 566). There must be a "reasonable 'fit' between the government's ends and the means chosen to accomplish those ends." *Fox*, 492 U.S. at 470.

While recent Supreme Court precedent suggests that something more rigorous than *Central Hudson*-style scrutiny may be warranted for commercial speech,[65] the test advanced by *Central Hudson*, *Fox*, and *Sorrell* represents a lesser burden than intermediate or strict scrutiny.

## b.  As-applied challenge: the parties' competing frameworks

As the plaintiff, Young bears the burden of proving the town has infringed on his speech. *See Ass'n of Cmty. Orgs. for Reform Now v. Town of E. Greenwich*, 453 F. Supp.

---

[64] Statement Agreed Facts (doc. no 45) at ¶ 27.

[65] For example, *City of Austin* applies intermediate scrutiny, requiring narrow tailoring to a significant government interest, to a law regulating commercial billboards. 596 U.S. at 76.

2d 394, 400 (D.R.I. Sept. 27, 2006) (citing *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004)). Once Young demonstrates that the restrictions infringe on his speech, the burden shifts to the town to prove that its restrictions pass the requisite constitutional scrutiny.  *Id.*  "This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on [] speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993).  The ensuing overlong exposition of the parties' argument is necessitated by the wide variation between the analytical frameworks they employ under the First Amendment.[66]

*Young's framework.*  Again, Young makes an as-applied First Amendment challenge to the town's enforcement action against Leavitt's Bakery.[67]  Young's is the simplest:  "An as-applied First Amendment challenge contends that a given statute or regulation is unconstitutional as it has been applied to a litigant's particular speech activity."[68]  The analysis turns on "facts about what happened in the specific case at issue and about how officials interpreted and applied the law," based on "a developed factual record and the application of a statute to a specific person.'"[69]  But "[t]he underlying constitutional standard [] is no different [in an as-applied challenge] than in a facial challenge." *Legal Aid Servs. of Or.*, 608 F.3d at 1096.

*Conway's framework(s).*  The town suggested two frameworks for analysis.  The first closely mirrors the plaintiff's approach, namely, that the court's analysis should focus on whether the town's speech restriction "satisf[ies] the requisite [constitutional] standard."[70]  This framework, as argued by the defendants in their pre-trial briefing, also turns on the "factual record and the application of a statute to a specific person." *Fusaro*,

---

[66] *See, e.g.* Def.'s Pre-trial Brief (doc. no. 48) at 1, citing *Mahoney v. Doe*, 642 F.3d at 1116; Pls.' Post-Trial Mem. (doc. no. 56) at 3-4; Def.'s Post-trial Brief (doc. no. 55) at 1-2.

[67] As noted *supra* Section III.a., the plaintiffs stated in multiple conferences with the court and at trial that they do not facially challenge the statute, only its enforcement against Leavitt's Bakery. Plaintiff does not make a vagueness or overbreadth challenge to the ordinance, or raise any arguments about the ordinance's potential vagueness or overbreadth.

[68] Pls.' Post-Trial Mem. (doc. no. 56) at 3 (quoting *Legal Aid Servs. of Or. v. Legal Servs. Corp.,* 608 F.3d 1084, 1096 (9th Cir. 2010)).

[69] *Id.* at 3-4 (quoting *Fusaro v. Howard*, 19 F.4th 357, 368 (4th Cir. 2021)); *see also McCoy,* 59 F.4th at 506 ("McCoy produces no evidence -- and we discern none -- that the application of the Ordinance to his trailer could not be justified without reference to the painted words."); *Signs for Jesus*, 977 F.3d at 109 (finding no merit in an as-applied challenge where the plaintiff "fail[ed] to identify any [] reason to suspect the Town applie[d] its statute in anything but the commonsense way" applied by the court).

[70] Def.'s Pre-trial Brief (doc. no. 48) at 2, citing *Mahoney v. Doe*, 642 F.3d at 1116.  In its pre-trial briefing, the town suggested that the court's analysis should "proceed in three steps: first, determining whether the First Amendment protects the speech at issue, then identifying the nature of the forum, and finally assessing whether the [restrictions of speech] 'satisfy the requisite standard.'" *Id.*  Conway suggests that because the parties agree that the speech is protected and the forum is non-public, the court's analysis should focus on the third step.  *Id.*

19 F.4th at 368.

In its post-trial briefing the town suggested a different analytical framework. There, they argue for the first time that the plaintiffs' as-applied challenge be analyzed as discriminatory enforcement claim.[71]

Because the plaintiffs prevail under any approach, the court chooses, without deciding which is correct, to analyze the claim using the plaintiffs' suggested framework: it was the framework chosen by the plaintiff, it aligns with the first framework asserted by the defendants, and it entails the narrowest relief.

***Young's argument.*** Under this framework, Young argues that the town's application of the sign code to the display above the bakery violates the First Amendment because it is based on the message the town perceives the display to convey, which is a "disfavor[ed]," message.[72] Young further contends that the town's application of its sign code to the bakery's display prohibits him and his bakery from speaking in a way that others are allowed to speak, "all based on the town's content preferences."[73]

***Conway's argument.*** Conway argues that its enforcement of limitations on the total size area of "signs" is content-neutral and thus subject to intermediate scrutiny.[74] In what appears to be complete disregard of the record and trial evidence in this case as well as the language of the sign code, the town argues that "[a]ll displays in the Town that meet the definition of a 'sign' under the Town's Zoning Ordinance, regardless of their content or the owner of the property, are subject to the Town's sign regulations."[75] The town contends that its "threshold inquiry…does not involve singling out any topic or subject matter for differential treatment, but rather simply involves reading the sign at issue" [76] to "identify the person or entity the sign is affixed to or associated with, then determine whether the display meets the Ordinance's definition of sign."[77] Because the restrictions themselves go only to the size (and height and number) of "signs," Conway argues, the ordinance is content-neutral under *Reed* and *City of Austin*.[78]

The town alternately argues that Leavitt's speech is commercial, although it asserted at various points during the litigation, completely at odds with any evidence regarding its enforcement activities, as well as its own stipulations, that the ordinance would apply whether the speech is commercial or non-commercial.[79] All the evidence

---

[71] Def.'s Post-Trial Brief (doc. no. 55) at 1-2. *See infra* Section III.d., for the discriminatory enforcement analysis.

[72] Pl.'s Mem. Mot. Summ. J. (doc. no. 32-1) at 20.

[73] *Id.*

[74] Def.'s Pre-Trial Brief (doc. no. 48) at 6.

[75] Def.'s Mem. Mot. Summ. J. (doc. no. 30-1) at 4; *see also* Def.'s Statement Disputed Facts (doc. no. 45) at ¶¶ 4, 7, 8; *but see* Tr. PM (doc. no. 58) at 47:20-48:5.

[76] Def.'s Reply Mot. Summ. J. (doc. no. 38) at 2 (citing *City of Austin*, 569 U.S. at 71-72).

[77] Def.'s Pre-Trial Brief (doc. no. 48) at 5.

[78] Def.'s Obj. Mot. Summ. J. (doc. no. 36) at 8.

[79] *Compare* Def's Pre-Trial Brief (doc. no. 48) at 6 n. 2 ("Alternatively, the Town requests that the Court find that Young's sign is commercial speech.") *with* Def.'s Statement Disputed Facts (doc. no. 45) at ¶ 4 ("The Town does not distinguish between commercial or business speakers

shows that the town in fact only applies the sign code—in direct contravention of the code's express language—to commercial speech.  *See infra*, Section III.c.

### c.  Analysis of as-applied challenge

"As a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Alvarez*, 567 U.S. 709, 715 (2012) (quoting *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002)).

The parties agree that the display is subject to First Amendment protection, though they disagree as to the extent of the protection.[80]  But no matter what level of scrutiny applies, the town's enforcement action against Leavitt's would fail for the complete disconnect between what the ordinance purports to regulate and the town's enforcement, as well as the illogical way it applied and explained that enforcement to Leavitt's, and its attempts to persuade Leavitt's to bring its display into (what it incorrectly viewed as) compliance with the code.

The ordinance regulates the size, height, and number of "signs" on a property, and the town states that its interests are, *inter alia*, safety and aesthetics.  But in practice, Conway only subjects a display to the ordinance's restrictions if the display depicts products sold (or activities conducted) on the premises,[81] leaving unregulated displays of equal size and height that do not depict such products or activities.[82]  In fact, town officials told Young he could keep his display if he were to paint over the baked goods— *changing nothing about the size or height of the sign which the code purports to regulate*—or if he moved the display, *unchanged*, to a different building.[83]  The substantial mismatch between Conway's enforcement against Leavitt's and its purported interest in limiting the size, height, and number of signs in the town means that the enforcement would not withstand *any* level of scrutiny.

***Level of scrutiny.***  The enforcement action is likely subject to some level of intermediate scrutiny.  No evidence suggests that the town engaged in viewpoint discrimination, outside of a general preference for non-commercial signage.  *See Reed*, 576 U.S. at 168-69 (explaining that viewpoint discrimination "target[s] viewpoints within

---

[80] and others when applying its Ordinance's definition of sign.") *and* Def.'s Mem. Mot. Summ. J. (doc. no. 30-1) at 1 ("The Town's Sign Code applies to all signs, commercial and noncommercial, that meet the Town's definition of 'sign.'").

[80] Def.'s Pre-trial Brief (doc. no. 48) at 1-2.

[81] Statement Agreed Facts (doc. no. 45) at ¶¶ 34-35.  The parties agree that the town applied the sign code to Leavitt's display because the donuts, muffins, and baked goods included in the display depict items sold inside the building to which the display is affixed.  *Id.* at ¶ 43.

[82] *Id.* at ¶ 33.

[83] *See id.* at ¶ 49 ("Why can't we compromise? . . . [W]hy don't you . . . alter the mural so it doesn't meet the definition of a sign. [I]s that something you could consider?") and ¶ 47 (A member of the public asked in a ZBA meeting, "[i]f [Young] was to take that sign and move it to the back building, which is not part of the bakery, would it still be a sign or would it be a mural?" to which the ZBA Chair answered "[I]t would be a mural.").

[a] subject matter" and is an "egregious" form of content discrimination).  Instead, as the evidence established, the town enforced its ordinance against a wide array of commercial signs, not targeting certain types of businesses or business speakers, or certain commercial signs in particular.  While *Reed* makes clear that strict scrutiny also applies to content-based regulation, *id.*, Conway's regulation of Leavitt's turned only on the display's depiction of the bakery products sold on the premises, resembling the ordinance at issue in *City of Austin.*

In *City of Austin*, the Court held that the city's sign ordinance, which distinguished between signs relating to on-premises and off-premises products or services, was not content-based (such that strict scrutiny would apply) merely because the off-premises distinction required a reading a sign to determine whether it directed readers offsite.  596 U.S. at 71.  The *City of Austin* ordinance distinguished signage content based solely on whether a sign was located on same premises as the product or service addressed in the sign—the message on the sign mattered only to extent that it informed a sign's relative location.  *Id.*  Because a sign's "substantive message" was "irrelevant to the application of the provisions, the [ordinance's] on-/off-premises distinction was similar to ordinary time, place, or manner restrictions," subjecting it only to intermediate scrutiny.  *Id.*  Here, no evidence suggests that the "substantive message" of the Leavitt's display mattered to zoning officials, only its depiction of products sold inside the building it sits on.  *See id.*

Finally, the lesser burden of the *Sorrell* and *Central Hudson* intermediate scrutiny test likely applies because Leavitt's display is commercial speech.[84]  Courts evaluating whether communications that combine elements of commercial and non-commercial speech, like the Leavitt's display, should be treated as commercial speech look at "whether the communication is an advertisement, whether the communication makes reference to a specific product, and whether the speaker has an economic motivation for the communication."  *Bad Frog Brewery, Inc. v. New York State Liquor Auth.*, 134 F.3d 87, 97 (2d Cir. 1998) (citing *Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 66-67 (1983)).  "[W]hile none of these factors alone would render the speech in question commercial, the presence of all three factors provides 'strong support' for such a determination."  *Id.* (finding that a brewery's beer labels showing a frog misbehaving was commercial speech because "the labels are a form of advertising, identify a specific product, and serve the economic interest of the speaker").  Like the label in *Bad Frog Brewery*, the Leavitt's display is "reasonably to be understood as attempting to identify to consumers [products] of the [bakery]," and, as much as the beer labels do, "serves to

---

[84] The court readily makes this finding without reservation, despite the plaintiff's counsel's generally unhelpful insistence, especially early in the litigation, and the plaintiff's dubious testimony, that the display is a "mural" (not a sign) solely intended as an artistic expression, and thus not commercial speech.  *See* Tr. AM (doc. no. 57) at 23:10-19, 29:16-25, 57:2-15, 60:1-61:1.  Of course, it is a sign under the language of the sign code and under the town's interpretation of its code, and it quite clearly proposes a commercial transaction (the sale of baked goods) at and inside the structure on which it is erected.

propose a commercial transaction." [85]  *See id.*  The display serves the economic interests of the bakery by drawing attention to the bakery and the products it sells.  Young discussed the display's contents with the high school art teacher, even if he did not overtly suggest the design. [86]  The display is also integrated with the bakery's dormer, which prominently centers the bakery's logo.  The bakery uses a likeness of the display on its boxes. [87]  All of these features readily demonstrate the display's commercial nature.  But because the enforcement fails even the lesser standard set out in *Sorrell* and *Central Hudson*, [88] and would likely fail even a lower standard of scrutiny, the court need not decide whether a stricter form of scrutiny should apply.

  ***Conway's asserted interests***.  Assuming some form of intermediate scrutiny applies, the town's enforcement of its zoning code must at a minimum "directly advance[] a substantial governmental interest."  *See Sorrell*, 564 U.S. at 572; *Fox*, 492 U.S. at 480-81; *Central Hudson Gas,* 447 U.S. at 566.

  The town advances three interests to support its sign restrictions: safety, natural beauty, and "equal treatment," [89]  arguing that the size restriction promotes safety "by limiting distractions to drivers and preventing hazards from excessive signage," natural beauty by "limiting the amount of signage that could distract from the natural beauty of the Town," and equal treatment by "ensure[ing] that all signs, regardless of their content, receive equal treatment." [90]

  The court assumes, without deciding, that safety and natural beauty constitute "substantial" government interests.  *See Naser Jewelers, Inc. v. City of Concord*, 513 F.3d 27, 34 (1st Cir. 2008) ("Both traffic safety and community aesthetics have long been recognized to constitute significant governmental interests.").  The town's third stated

---

[85] The plaintiffs argue that the display does not propose a commercial transaction because no explicit price information appears on the sign.  Tr. AM (doc. no. 57) at 58:22-60:8.  The court disagrees.  The Leavitt's display, which is graphically and thematically integrated with a dormer showing its logo and which appears, along with the logo, on the bakery's boxes, proposes a transaction as much as a beer label that "communicates no information beyond the source of the product."  *See Bad Frog Brewery, Inc.*, 134 F.3d at 96-97; *supra* n. 84.

[86] *See* Tr. AM (doc. no. 57) at 25:4-17 ("Q: Mr. Young, in that interview I heard you say: I just said I would like it to be bakery themed, maybe something with the Valley.  And why did you suggest the painting should have something to do with the Mt. Washington Valley?  A: Because it's such a destination.  I mean, the locals feel very passionate about the Valley.  People come to visit.  I mean, it's just -- everyone loves the Valley, and, you know, I just wanted it to I guess represent the Valley.  Q: And similarly, why did you suggest that the painting should be bakery themed?  A: It just makes sense.  I'm a bakery.  Q: Context?  A: Yeah, yeah."); *see also* Trial Ex. 38 (text messages between Young and high school art teacher showing discussion of mural).

[87] Trial Ex. 2; Tr. AM (doc. no. 57) at 54:19-55:10.

[88] The court finds no meaningful distinction between the commercial speech tests outlined in *Sorrell* and *Central Hudson*.  To the extent a meaningful distinction exists, it is not implicated by the facts of this case.

[89] Def.'s Statement Disputed Facts (doc. no. 45) at ¶¶ 1-3.

[90] *Id.*

interest is in "ensur[ing] that all signs, regardless of their content, receive equal treatment," namely that "each property owner within their respective district [is] subjected to the same requirements for signage," which would also "reduce 'sign competition' among property owners."[91]  While it is probably almost a truism that having an objective codified rule regarding nearly any activity (including permissible signage) in some measure facilitates equal treatment, the town has not provided any decisional authority supporting "equal treatment" as an important, substantial, or significant state interest under any level of heightened scrutiny.  Of course, the town is constitutionally prohibited from engaging in discriminatory enforcement of its ordinance.  *See infra* Section III.d.; *see also Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002) ("[g]ranting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional").[92]  But this obligation not to engage in discriminatory enforcement of a regulation cannot itself be a basis for the regulation's constitutional viability—put differently, a regulation that impermissibly restricts speech cannot withstand scrutiny simply because a government enforces it "equally."

**_Reasonable fit._**  Even assuming that the town's stated interests are sufficiently substantial, there must be, at minimum, a "reasonable 'fit' between the [government's] ends and the means chosen to accomplish those ends." *Fox*, 492 U.S. at 470; *see also City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 416 (1993).   Here the town's enforcement of its sign code against Leavitt's fails because its particular application to Leavitt's bears no relationship to the interests the town asserts.  *See Discovery Network, Inc.*, 507 U.S. at 424 ("Not only does Cincinnati's categorical ban on commercial newsracks place too much importance on the distinction between commercial and noncommercial speech, but in this case, the distinction bears no relationship *whatsoever* to the particular interests that the city has asserted.") (emphasis in original).

The town argues that its enforcement against Leavitt's promotes safety because it "limit[s] distractions to drivers and prevent[s] hazards from excessive signage."[93]  For example, as Gibbs stated at trial, excessive signage could "potentially block driveways or people's [] vision," or be "distracting" if it was "flashing or blinking."[94]  But in practice the town's enforcement is underinclusive—it only limits displays that come within its (clearly incorrect) interpretation of "sign" under § 190-31,[95] which in turn depends on

---

[91] Def.'s Mem. Mot. Summ. J. (doc. no. 30-1) at 10.

[92] There is no evidence that the town, when it decides that the ordinance applies to a display, enforces that ordinance unequally.  In fact, evidence suggests a pattern of enforcement against displays that show or suggest goods or services for sale on the same premises as the sign.  *See infra,* Section III.d; *see also* Def.'s Post-Trial Brief (doc. no. 55) at 2.  And the town's enforcement does have the direct effect of limiting the size and number of on-premises advertising displays.

[93] Def.'s Statement Disputed Facts (doc. no. 45) at ¶ 1.

[94] Tr. AM (doc. no. 57) at 117:5-22.

[95] For example, the town originally cited the "Heritage" mural at Settler's Green for violating the sign code's size restrictions, but reversed course when it determined that the display did not depict any commercial products or services sold at Settler's Green mall and therefore was not a

whether the content of the sign relates to the goods or services sold at the premises where the sign is located.[96]  As town representatives suggested to Young, the same display hung on a different building, or painted with "mountains" instead of "muffins," "would [be] fine."[97]  In fact, in response to a sarcastic question intended to highlight the irrationality of the town's enforcement, zoning officer Gibbs told Young that that the display would have been permitted if it read "Conway hates the Kennett High School art students," rather than depicting muffins and donuts.[98]  There is no basis to assume a sign depicting baked goods would have a different effect on safety than a sign depicting mountains (or anything else), a fact the town's representatives confirmed at trial.[99]  Because the same size display on the same building would be exempt from size restrictions if its content were slightly different (*e.g.*, mountains instead of muffins), there is no rational relationship between the town's stated safety interest and its enforcement against Leavitt's; the unregulated display would have the exact same safety hazards as the regulated display.

Similar reasoning applies to the town's second stated interest in "limiting the amount of signage that could distract from the natural beauty of the Town,"—*i.e.* maintaining a certain community aesthetic standard.[100]  Here again the town's stated reasoning undermines its stated interest.  Conway would allow the Leavitt's display if it was located on different premises, or if it had slightly different content—in fact, ZBA members made clear to Young that the display could depict essentially *anything* other than baked goods and go unregulated.[101]  The same reasoning goes for the other displays

---

sign subject to size restrictions.  Tr. PM (doc. no. 58) at 59:7-14, 61:8-15; Statement Agreed Facts (doc. no. 45) at ¶¶ 59, 62-63, 72.  Similarly, ZBA members encouraged Young to paint over the baked goods on his display to exempt it from regulation as a "sign."  Statement Agreed Facts (doc. no. 45) at ¶ 49.  Zoning Officer Gibbs confirmed that he had never issued a citation or notice of violation to a non-commercial display owner.  Tr. AM (doc. no. 57) at 123:7-11.

[96] As noted *supra* Section II.c., the town applies the signage size restrictions to commercial businesses (an idea expressly disavowed by the sign code definition) and focuses on the relationship between the content of the display and the activities conducted at the premises (while the sign code definition expressly ignores content altogether).  *See* Statement Agreed Facts (doc. no. 45) at ¶¶ 34-35 ("If Town officials perceive a physical display as conveying a message in any way related to business, they deem the physical display a sign.  At a deposition, the Town's representative Mr. Gibbs testified that the Town, 'when determining whether something was a sign or not would look at what it depicted and whether it had a relationship to the – what was happening inside the business.'")

[97] *Id.* at ¶ 44.  ZBA members made similar comments about other displays by local businesses, noting that the screens displayed by Joe Jones would not be regulated if they depicted "flowers" instead of mountain gear and equipment, and the Wings mural would not be regulated if the owners painted over the pocketbooks depicted inside the butterflies' wings.  *See id.* at ¶¶ 53, 66.

[98] Tr. AM (doc. no. 57) at 33:4-5.

[99] *Id.* at 105:15-106:7.

[100] Def.'s Statement Disputed Facts (doc. no. 45) at ¶ 2.

[101] Statement Agreed Facts (doc. no. 45) at ¶¶ 48-49; Tr. AM (doc. no. 57) at 33:4-5.

regulated by the town (for instance the Wings mural, the Weston Farm Stand display, and the Joe Jones displays). While Conway may have an interest in limiting the aesthetics, number, and size of displays in the town, those interests are undermined if the only regulated displays are those that depict products or services sold on the premises where the display is located, and no others. *See Discovery Network, Inc.*, 507 U.S. at 425 ("[P]ublishers' newsracks are no greater an eyesore than the newsracks permitted to remain on Cincinnati's sidewalks. Each newsrack, whether containing 'newspapers' or 'commercial handbills,' is equally unattractive.").[102]

As noted above, the court is skeptical that "equal treatment" constitutes a substantial state interest, but even if it did, the town's enforcement against Leavitt's would not advance its goal of subjecting property owners to the same requirements. As one ZBA member confirmed, the Leavitt's display would be regulated if displayed by the bakery but not if it were displayed on a different building.[103] And although Conway's enforcement of the ordinance may limit the size and number of displays in the town overall, it does nothing to address "sign competition" among owners of unregulated signs and displays. *See Discovery Network, Inc.*, 507 U.S. at 426 ("[T]he city's primary concern, as argued to us, is with the aggregate number of newsracks on its streets. On that score, however, all newsracks, regardless of whether they contain commercial or noncommercial publications, are equally at fault.").

Conway argues that its enforcement "leave[s] open ample alternative channels for communication of the information." *See Signs for Jesus*, 977 F.3d at 101. The court agrees—a restriction on the size of the Leavitt's display would by no means foreclose the bakery's ability to communicate the information in the display. But the fact that alternative channels for communication are available does not overcome the deeply irrational way—both internally illogical and untethered to its provision's text—that Conway has enforced its sign code against Leavitt's.

Because the town's enforcement against Leavitt's bakery has no rational connection to any of its stated interests, the ordinance, as applied here to the Leavitt's

---

[102] The town does not argue that its enforcement targets commercial displays (or the prohibited connection between location/premises and goods/services provided) because of their greater likelihood to proliferate than non-commercial displays, but without evidence showing that commercial displays are more responsible for proliferations, safety hazards, or visual blight than non-commercial displays, such an argument would similarly fail. *See Discovery Network, Inc.*, 507 U.S. at 426-27 (rejecting the government's argument that "safety concerns and visual blight may be addressed by a prohibition that distinguishes between commercial and noncommercial publications that are equally responsible for those problems," and noting that the court "specifically declined to recognize a distinction between commercial and noncommercial speech that would render this interest a sufficient justification for a prohibition of commercial speech."). Neither party presented evidence that commercial displays contribute more to sign proliferation or visual blight that do noncommercial displays. In fact, neither party presented any evidence on sign proliferation in Conway.

[103] Statement Agreed Facts (doc. no 45) at ¶ 47.

display, is unconstitutional.

### d. Discriminatory enforcement

In its post-trial briefing, the town suggested for the first time that Young's challenge should be analyzed as a content or viewpoint discrimination claim. Although Young never explicitly framed his claim in this way, he does claim that the town's enforcement of the sign ordinance against Leavitt's, Settler's Green, Lickety Splitz, Mt. Washington Observatory, Joe Jones Ski & Sport, and Weston's Farm Stand demonstrates the town's "discriminatory enforcement" against messages that town officials perceive as "commercial," "favor[ing] some speakers over others in a manner that indicates a preference for certain content" as prohibited by *Reed*.[104] But because neither party analyzed the claim under a discriminatory enforcement framework at trial, they did not tailor their evidence or arguments specifically to this kind of claim.

The plaintiffs would prevail under the simple as-applied framework the plaintiffs suggest, discussed in Section III.c., *supra*, and probably, on this record, under the discriminatory enforcement framework the defendant suggests. The court thus chooses to apply the plaintiff's as-applied framework, and not the discriminatory enforcement framework, because the plaintiffs chose it, the corresponding relief is narrower, and the parties did not present evidence and arguments specific to a discriminatory enforcement claim at trial. Nevertheless the court discusses briefly the merits of the claim under a discriminatory enforcement framework.

Discriminatory enforcement suits involve claims that a given law "itself is neutral and constitutional in all fact situations, but that it has been enforced selectively in a [content or] viewpoint discriminatory way." *McCoy*, 59 F.4th at 506 (citing *McGuire v. Reilly*, 386 F.3d 45, 61 (1st Cir. 2004)) (alteration in original). "To mount this type of challenge, [a plaintiff] must show a 'pattern of unlawful favoritism.'" *Id.* (quoting *McGuire*, 386 F.3d at 62). In other words, "[a] plaintiff must show that a municipality's content-discriminatory enforcement of an ordinance is the result of an intentional policy or practice," and that that policy or practice was "unlawful." *Id.* (quoting *Hoye v. City of Oakland*, 653 F.3d 835, 855 (9th Cir. 2011) and *McGuire*, 386 F.3d at 64).

***Intentional policy or practice***. The trial evidence established that the town has an intentional, albeit unwritten and uncodified, policy of enforcing its sign ordinance only against commercial speakers.[105] As acknowledged by members of the ZBA, their interpretation of what constitutes a sign is significantly narrower than the ordinance as

---

[104] Pls.' Pre-Trial Brief (doc. no. 47) at 12.

[105] *See, e.g.*, Tr. AM (doc. no. 57) at 123:7-11 ("COURT: Have you ever issued, you know, a citation or a notice of violation or anything else to a speaker or a display owner that was not a business, not commercial? THE WITNESS: No, your Honor."); Tr. PM (doc. no. 58) at 59:7-14 ("Q: Okay. So that was the wings display. But as far as the heritage display goes the heritage display was treated differently right? A: Yes. Q: And the ZBA determined that the heritage display was not a sign because the ZBA thought the content of the heritage display did not convey a commercial message, right? A: Correct."); Statement Agreed Facts (doc. no. 45) at ¶¶ 40-41, 51-72.

written, which could be read to encompass almost any display "communicating *information of any kind* to the public."[106]  Instead, the parties agree that if town officials perceive a physical display as "conveying a message in any way related to business, they deem the physical display a sign."[107]  The town applies this (textually incorrect) interpretation with "remarkabl[e] consisten[cy]"[108] to a variety of businesses, including Lickety Splitz, Weston's Farm Stand, Settler's Green, Mt. Washington Observatory, and Joe Jones.[109]  As the town itself states in its brief, "each time the [ZBA] was faced with making a decision on whether a display was a sign on the ordinance, it used the same process, and applied the same interpretation of the definition of 'sign,'"[110] although it seems clear that that interpretation is not supported by the sign code.

 ***Lawfulness of policy***.  As discussed extensively in Section III.C., *supra*, based on the evidence in the record, the town's policy of enforcement against commercial speakers would likely fail under any applicable level of scrutiny because it bears little rational relationship to the town's stated interests; on this record, there is no "reasonable 'fit' between the government's ends and the means chosen to accomplish those ends."  *See Fox*, 492 U.S. at 470.  Thus, had a discriminatory enforcement claim been properly pleaded, adequately developed in briefing, and addressed with evidence, the plaintiffs would likely have prevailed.

 Because the plaintiffs did not specifically argue discriminatory enforcement, and seek only narrow relief concerning their own display, and because the parties did not present evidence specific to it at trial, the court does not base its findings in this case on a discriminatory enforcement claim.  The holding in this case is narrow and limited to the record.  The court does not reach the question whether, under certain facts and circumstances, Conway might be able to justify differential treatment of commercial and noncommercial signs.  It simply holds that on this record, with respect to these plaintiffs, Conway has failed to make such a showing.

### e. Remaining injunctive relief factors

 Having found that the plaintiffs are entitled to prevail on the merits of their claim, the court turns to briefly examine the remaining injunctive relief factors.  Plaintiffs must show that in the absence of injunctive relief, they would suffer irreparable injury.  *Joyce*, 720 F.3d at 25.  "It is well established that the loss of first amendment freedoms

---

[106] *See* Tr. PM (doc. no. 58) at 80:2-23 (discussing with the ZBA Chair the meaning of the phrase "communicate *information of any kind* to the public, whether commercial or noncommercial" in the town's sign definition) (emphasis added); Statement Agreed Facts (doc. no. 45) at ¶ 27 (Conway Zoning Code § 190-31 defining wall sign).

[107] Statement of Agreed Facts (doc. no. 45) at ¶ 34. The parties also agreed that if the town had decided that the Leavitt's painting was not a sign, then the sign code, including its size limitations, would not apply.  *Id.* at ¶ 33.

[108] Def.'s Post-Trial Brief (doc. no. 55) at 2.

[109] Statement Agreed Facts (doc. no. 45) at ¶¶ 51-72.

[110] Def.'s Post-Trial Brief (doc. no. 55) at 2.

constitutes irreparable injury." *Maceira v. Pagan,* 649 F.2d 8, 18 (1st Cir.1981) (citing *Elrod v. Burns,* 427 U.S. 347, 373 (1976)).

Next, the plaintiffs must establish that "the harm to the plaintiff would outweigh the harm to the defendants from an injunction." *Joyce,* 720 F.3d at 25. Here, the plaintiffs' interest in avoiding interference with their First Amendment rights outweighs the town's interest in an unconstitutional enforcement action. *See Diva's, Inc. v. City of Bangor,* 21 F.Supp.2d 60, 66 (D. Me. 1998) (granting injunction in part because the city's "[f]ailure to demonstrate a connection between enforcement of the Ordinance and [the stated purposes of the Ordinance] deprive the City of any claim that it would be harmed by the grant of a permanent injunction").

Finally, to obtain a permanent injunction, Plaintiffs must show that "the injunction would not adversely affect the public interest." *Joyce,* 720 F.3d at 25. The court finds that the issuance of an injunction promotes the public interest because the plaintiffs have demonstrated that the enforcement of the ordinance against them is unconstitutional. "Protecting rights to free speech is ipso facto in the interest of the general public." *Westfield High Sch. L.I.F.E. Club v. City of Westfield,* 249 F.Supp.2d 98, 128 (D.Mass.2003). Accordingly, the plaintiffs have satisfied the necessary steps for attaining permanent injunctive relief.

## IV.    Conclusion

Conway's town officials testified credibly, and the minutes of town proceedings in the record indicate that they conducted themselves conscientiously and in good faith in managing town business. Conway enforces its sign code to limit the size of displays that it perceives as containing information that connects to the items being sold by the speaker on the same premises as the display. It contends that its ordinance applies to noncommercial speakers, but produced no evidence showing that was the case in practice. Conway's enforcement is unconstitutional as applied to the plaintiffs' display. Conway is enjoined from enforcing its ordinance against Leavitt's bakery in the operationally illogical, textually unsupportable manner it employed in this instance.

**SO ORDERED.**

Joseph N. Laplante
United States District Judge

Dated:  May 19, 2025

cc:    Counsel of record